AUDREY STRAUSS
United States Attorney for the
Southern District of New York
By:  DAVID W. DENTON, JR.
     KIMBERLY J. RAVENER
     Assistant U.S. Attorneys
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2744/2358

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

               Plaintiff,

     - v. -

THE TANKER VESSEL KNOWN AS THE
"COURAGEOUS," BEARING INTERNATIONAL
MARITIME ORGANIZATION NUMBER 8617524,

           Defendant-in-rem.

- - - - - - - - - - - - - - - - - - - - X

**VERIFIED COMPLAINT
FOR FORFEITURE**

21 Civ.

Plaintiff United States of America, by its attorney, Audrey Strauss, United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

## I.   NATURE OF THE ACTION

1.   This is an action by the United States of America seeking forfeiture of the tanker vessel known as the "Courageous," bearing International Maritime Organization

1

("IMO") number 8617524(the "Courageous" or "M/T Courageous").  A photograph of M/T Courageous is attached hereto as Exhibit A.

2.    The Courageous is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property constituting or derived from proceeds traceable to violations of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 et seq.  The Courageous is also subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in money laundering transactions, in violation of 18 U.S.C. § 1956, and as property traceable to such property.  The Courageous is also subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(I), as property involved in violations of a prohibition imposed pursuant to section 104(a) of the North Korea Sanctions and Policy Enhancement Act of 2016 (the "NKSPEA"), codified at 22 U.S.C. § 9201 et seq.

## II.    JURISDICTION AND VENUE

3.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

4.    Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

### III.   THE NORTH KOREA SANCTIONS REGIME

5.   This civil forfeiture action relates to violations of regulations and Executive Orders issued pursuant to the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 et seq.  IEEPA, enacted in 1977, gives the President certain powers, defined in § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations.  Pursuant to that authority, and as directed by the NKSPEA, the President and the executive branch have issued a series of orders and regulations governing and prohibiting certain transactions relating to the DPRK, including regulations implementing United Nations Security Council Resolutions ("UNSCR") and prohibiting transactions by U.S. persons, involving U.S.-origin goods, or using the U.S. financial system (collectively the "North Korea Sanctions").

6.   Pursuant to Title 50, United States Code, Section 1705(a), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and pursuant to Section 1705(c), "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an

unlawful act described in subsection (a) of this section shall" be guilty of a crime.

7.    In 2008, 2010, and 2011, the President issued a series of three Executive Orders regulating transactions with North Korea pursuant to his authorities under IEEPA. See Executive Orders 13466 (June 26, 2008); 13551 (Aug. 30, 2010); 13570 (Apr. 18, 2011).  To implement Executive Orders 13466, 13551, and 13570, the Department of the Treasury, Office of Foreign Assets Control ("OFAC") issued the North Korea Sanctions Regulations (the "NKSR"), 31 C.F.R. Part 510.

8.    On February 18, 2016, the President signed the NKSPEA to address the North Korean weapons of mass destruction threat.  The NKSPEA states that the President "shall designate" as a specially designated national ("SDN") any person who "knowingly, directly or indirectly, engages in money laundering . . . that supports the Government of North Korea or any senior official or person acting for or on behalf of that Government," 22 U.S.C. § 9214(a)(6); and Congress specifically found that "[t]he Government of North Korea has been implicated repeatedly in money laundering," 22 U.S.C. § 9201(a)(3).  In addition, the President "shall designate" as an SDN any person who "knowingly, directly or indirectly, provides significant amounts of fuel or supplies, provides bunkering services, or

facilitates a significant transaction or transactions to operate or maintain, a vessel or aircraft that is designated under an applicable Executive order or an applicable United Nations Security Council resolution." 22 U.S.C. § 9214(a)(12). Once the executive branch designates a person, entity, or vessel as an SDN, U.S. persons or entities are prohibited from engaging in transactions for the benefit of an SDN, including by processing transactions through the U.S. financial system for the benefit of an SDN.

9. In addition to the enactment of the NKSPEA, the President issued another series of three executive orders -- Executive Orders 13687, 13722, and 13810 -- further regulating transactions with North Korea pursuant to his authorities under the IEEPA. See Executive Orders 13687 (Jan. 2, 2015); 13722 (Mar. 18, 2016); 13810 (Sept. 21, 2017). In particular, on March 18, 2016, the President issued Executive Order 13722 ("Blocking Property of the Government of North Korea and the Workers' Party of Korea, and Prohibiting Certain Transactions With Respect to North Korea") to address "North Korea's continuing pursuit of its nuclear and missile programs." Executive Order 13722 expressly prohibits:

> the exportation or reexportation, direct or indirect, from the United States, or by a

United States person, wherever located, of any
goods, services, or technology to North Korea;

new investment in North Korea by a United
States person, wherever located; and

any approval, financing, facilitation, or
guarantee by a United States person, wherever
located, of a transaction by a foreign person
where the transaction by that foreign person
would be prohibited by this section if
performed by a United States person or within
the United States.

10.   On March 5, 2018, OFAC amended the NKSR and

reissued them in their entirety to implement Executive Orders

13687, 13722, and 13810, and to reference the NKSPEA.   See

Federal Register, Vol. 83, No. 43 (Mar. 5, 2018).   The

provisions of Executive Order 13722 were codified in the NKSR at

31 C.F.R. § 510.206.   Section 510.405 of the NKSR elaborates on

the meaning of terms in Section 510.206, and, as relevant here,

provides that the prohibition on the provision of services "to

North Korea" in Section 510.206 applies "where the benefit of

such services is otherwise received in North Korea."

11.   The international community has also taken steps

to control illicit North Korean activity.   The United Nations

Security Council has banned all member states from allowing

"their nationals, any persons subject to their jurisdiction,

entities incorporated in their territory or subject to their

jurisdiction, and vessels flying their flag, from facilitating

or engaging in ship-to-ship transfers to or from DPRK-flagged vessels of any goods or items that are being supplied, sold, or transferred to or from the DPRK." UNSCR 2375 (Sept. 11, 2017),

11.   The United Nations Security Council has also banned all member states from allowing "the direct or indirect supply, sale or transfer to the DPRK, through their territories or by their nationals, or using their flag vessels or aircraft, and whether or not originating in their territories, of all refined petroleum products." Id. at 14.   Although certain exceptions allow limited transfer of refined petroleum products, the United Nations requires that member states engaged in legal trade report to the United Nations "every thirty days of the amount of such supply, sale, or transfer to the DPRK of refined petroleum products along with information about all the parties to the transaction." Id.

## IV.   PROBABLE CAUSE FOR FORFEITURE

### A.   Overview

12.   This civil forfeiture action arises from a national security and counterintelligence investigation of a scheme to access unlawfully the United States financial system to support illicit shipments to and from the DPRK.   The scheme was orchestrated by a Singaporean national ("CC-1"), through Courage Maritime SA, a shell company incorporated in Panama;

7

Swansea Port Services, a Singaporean company; New Eastern Shipping, a purported Chinese company used as a straw purchaser for M/T Courageous; and other entities (the "DPRK Shipping Scheme").

13.   The DPRK Shipping Scheme facilitated shipments of petroleum products to North Korea, providing a critical resource for the North Korean government and for DPRK-based companies. In particular, the DPRK Shipping Scheme used the M/T Courageous to transfer petroleum to a DPRK-flagged vessel sanctioned by both the United States and the United Nations, and to direct delivery of cargo to Nampo, North Korea's principal seaport.

14.   To facilitate this activity by M/T Courageous for the benefit of North Korea, CC-1 directed payments in U.S. dollars, including to purchase the M/T Courageous and for necessary services for the operations of M/T Courageous, including salary payments for crewmembers and fees related to services for M/T Courageous.  At least some of those U.S. dollar payments were made through front companies to obscure the true purpose of the payments, that is, to promote shipments on M/T Courageous for the benefit of North Korea.  These payments were routed through correspondent banks located in the United States, including in the Southern District of New York, causing those

banks to violate the prohibition on the export of financial services to or for the benefit of North Korea.

**B.    The Purchase of M/T Courageous for the DPRK Shipping Scheme**

15.    M/T Courageous is the current vessel name for a 2,734-ton oil products tanker ship originally built in 1987. Every cargo vessel of at least 300 gross tons is assigned a unique reference number by the IMO.   Although a vessel's name can be changed by its owner, the IMO number remains connected to a ship's hull, even if the ship's ownership or flag state change.   M/T Courageous is assigned IMO 8617524.   Commercially-available databases of IMO-registered vessels also include photographs of M/T Courageous.

16.    Up until on or about July 19, 2019, M/T Courageous, which was known at that time under the name "Sea Prima," but still bearing IMO 8617524, was owned by a company incorporated in the British Virgin Islands ("Company-1"), and was registered with the flag state of St. Kitts and Nevis.   On or about July 19, 2019, Company-1 sold M/T Courageous to New Eastern Shipping, a company ostensibly registered in the People's Republic of China, for $580,000.   The bill of sale was denominated in U.S. dollars for payment.   New Eastern Shipping

was represented in the sale by a purported broker, Singapore-based Swanseas Shipping, and its proprietor, CC-1.

17.   The purchase of M/T Courageous was made in a series of nine separate U.S. dollar transactions between July 8, 2019 and July 17, 2019.  Records from Company-1 show that the final payment for $78,006.33 on or about July 17, 2019.

18.   Bank records show that this payment was sent through the correspondent account of a U.S. financial institution ("U.S. Bank-1"), located in the Southern District of New York.  Although the true beneficiary of the payment was correctly identified, i.e., Company-1, the originator of the payment was identified as "Visson Electronics Co. Limited," and not the true originator, New Eastern Shipping.  It appears that this payment reflects the use of a front company to conceal the true identity of the purchaser from the financial institutions processing the transaction, including U.S. Bank-1.

19.   Further, it appears that New Eastern Shipping was itself a straw purchaser of M/T Courageous, but that the purchase was in fact intended to facilitate the use of M/T Courageous by CC-1 in furtherance of the DPRK Shipping Scheme. For example:

a.   On or about June 25, 2019, CC-1 sent an email to an individual providing services related to M/T

10

Courageous ("Individual-1") attaching documents regarding M/T Courageous and describing it as "the Ship we buy."  In the email, CC-1 described his plan "to put her on the voyage under our operations."

b.   Later, on or about October 8, 2019, in an email to an individual ("Individual-2") representing a Thailand-based company that was providing services related to M/T Courageous ("Company-2"), CC-1 stated that "at time of delivery, we still do not register offshore company as owner, therefore you will see the bill of sales owner is New Eastern Shipping Co Ltd.  Please advise me is this bill of sales valid or I have to registered [sic] another Offshore Company by the name of New Eastern Shipping Co., Ltd."  Individual-2 responded that it would be possible to rearrange the ownership structure so that "Courageous Maritime SA becomes the front Owner of Ship Courageous."

c.   Approximately two months later, on or about December 13, 2019, Individual-2 sent CC-1 an email attaching documents that Individual-2 described as the "word form and procedures to use to apply Belize Company for New Eastern shipping co., Ltd.  The contact address has to be China as shown in the bill of sale."  It appears from this email and others that Individual-2 was aware that New Eastern Shipping was merely

11

a front for the purchase of the vessel on behalf of CC-1, for use in the DPRK Shipping Scheme.

20.   A "flag state" is the jurisdiction under the laws of which the vessel is registered or licensed.   A merchant vessel must be registered, and can register in only one jurisdiction at a time.   On or about August 21, 2019, the International Ship Registry of St. Kitts and Nevis terminated the registration of the vessel bearing the IMO number of M/T Courageous.   M/T Courageous was not registered with another flag state as required at that time.

21.   Following the sale of the vessel in July 2019, when M/T Courageous was in port in Kaohsiung, Taiwan, Taiwanese authorities obtained a record of the crew list of M/T Courageous.   Among other personnel, the list identified by name the Captain ("CC-2" or the "Captain") and the Chief Engineer ("CC-3" or the "Chief Engineer") of M/T Courageous during the time period of the DPRK Shipping Scheme.

C.   **The Use of M/T Courageous to Violate the North Korea Sanctions**

1. **M/T Courageous Goes Dark**

22.   The International Convention for the Safety of Life at Sea ("SOLAS"), a maritime treaty, requires vessels of greater than 300 gross tons engaged on international voyages to

carry an automatic identification system ("AIS") capable of providing information about the ship to other ships and to coastal authorities automatically.  According to the IMO's website, SOLAS is "generally regarded as the most important of all international treaties concerning the safety of merchant ships."  That regulation requires that a ship's AIS be able to transmit the ship's identity, type, position, course, speed, navigational status, and other safety-related information automatically to appropriately equipped shore stations, other ships, and aircraft, as well as to receive automatically such information from similarly fitted ships.

23.  AIS signals are transmitted openly through radio signals, and are made available both through publicly available databases and to government agencies with responsibility for such matters.

24.  Continuous operation of AIS is a critical factor for safe ship operating, particularly for avoiding collisions with other vessels.  It is rare for a vessel engaged in legitimate transit to turn off the AIS system.  Accordingly, the fact that a vessel has turned off its AIS transmissions is typically evidence of an attempt to avoid detection of the vessel's location, course, speed, or other navigational status.

25.   On or about July 19, 2019, the day that the sale of M/T Courageous to CC-1 was finalized, M/T Courageous was broadcasting an AIS signal in the vicinity of Kaohsiung Anchorage, in Taiwan.   Between on or about July 19 and August 17, 2019, M/T Courageous continued broadcasting AIS information in the vicinity of Taiwan.   For a four-month period from approximately August 17, 2019 through approximately December 8, 2019, however, M/T Courageous turned off its AIS signal (the "Four Month Dark Period").

26.   The disabling of AIS is consistent with other DPRK-related efforts to avoid sanctions.   See, e.g., United States v. Bulk Cargo Carrier Known as the Wise Honest, 19 Civ. 4210 (PKC), Dkt. 1 at 32-36 (S.D.N.Y. 2019) (describing in forfeiture Complaint how seized North Korean vessel had disabled its AIS to avoid detection while evading relevant U.S. and U.N. sanctions); see also OFAC, Dep't of State, and U.S. Coast Guard, Updated Guidance on Addressing North Korea's Illicit Shipping Practices, Mar. 21, 2019 (the "OFAC Guidance") ("The International Convention for the Safety of Life at Sea requires that certain classes of vessels on international voyages maintain automatic broadcasts.   North Korea-flagged merchant vessels often intentionally disable their AIS transponders to mask their movements.   Similarly, vessels with which North Korea

14

conducts ship-to-ship transfers will typically disable AIS to evade detection to facilitate illicit trade.  This tactic, whether employed by North Korea-flagged vessels or third-country vessels involved in trade with North Korea, is a red flag for potentially illicit activity, as it is a violation of international regulations and is often done to conceal the origin or destination of cargo associated with North Korea.").

27.  Accordingly, it appears that during the Four Month Dark Period, the operators of M/T Courageous attempted to conceal information about the vessel's location, course, speed, or other navigational status.

## 2. The September 2019 Ship-to-Ship ("STS") Transfer

28.  On or about September 25, 2019, a commercial Earth-observation satellite took a high-resolution photograph showing M/T Courageous tethered to a vessel while at sea in Korea Bay (the "September 2019 STS Transfer").  The vessel to which M/T Courageous is tethered bears several unique characteristics identifying it as the vessel assigned IMO 8916293, currently known as the "Saebyol."  A copy of a satellite photograph of the September 2019 STS Transfer is attached as Exhibit B.

29.  The tethering of the ships depicted in the satellite photograph of the September 2019 STS Transfer attached

as Exhibit B is consistent with the means and methods of conducting a ship-to-ship transfer of petroleum. Ship-to-ship transfers of fuel, such as that depicted in the satellite photograph of the September 2019 STS Transfer, are a principal means by which North Korea seeks to evade U.S. and UN sanctions prohibiting such shipments to the DPRK. According to a March 5, 2019 report by the United Nations (the "UN Report"), "[s]hip-to-ship transfers of petroleum products by foreign-flagged vessels using flags of convenience are a primary method of sanctions evasion by the Democratic People's Republic of Korea." UN Report, ¶ 2. Similarly, on March 21, 2019, OFAC, the Department of State, and the U.S. Coast Guard jointly issued the OFAC Guidance, noting that "North Korea continues to evade sanctions, particularly through illicit ship-to-ship transfers of refined petroleum."

30. Data from commercially available databases and other publicly available information, including registration records, describe both M/T Courageous and the Saebyol as tanker vessels. Commercial shipping databases show that the Saebyol, to which M/T Courageous was attached in the September 2019 STS Transfer, is assigned the IMO number 8916293. The vessel bearing that IMO number, currently identified as the Saebyol, was formerly known as the "Chong Rim 2." The vessel bearing the

16

IMO number of the Saebyol was designated as an SDN by OFAC on or about March 16, 2016, pursuant to the NKSPEA and Executive Order 13722, for its operation in the transportation, mining, energy, and/or financial services industries in the North Korean economy.  The vessel bearing the IMO number of the Saebyol is also identified as being owned by Ocean Bunkering[1] JV, a DPRK-based entity that was also named as an SDN by OFAC on or about March 16, 2016, pursuant to the NKSPEA and Executive Order 13722.

31.  In March 2019, both the UN Report and the OFAC Guidance specifically identified the Saebyol as a vessel that had engaged in illicit ship-to-ship transfers on behalf of the DPRK.

32.  During the time period of the September 2019 STS Transfer, M/T Courageous was a stateless vessel.  The St. Kitts and Nevis registration assigned to the vessel under previous ownership had been terminated on or about August 21, 2019, *see supra* ¶ 20, and the vessel was not registered with another flag state until on or about November 4, 2019, *see infra* ¶ 35(c). Thus it appears that, when M/T Courageous conducted the

---

[1] "Bunkering" is a technical maritime term used to refer to the supplying of fuel for use by ships.

17

September 2019 STS Transfer, M/T Courageous was operating
illegally without registration with a flag state.

### 3. The November 2019 DPRK Port Visit

33.   On or about November 4, 2019, a commercial Earth-
observation satellite photographed M/T Courageous in close
proximity to petroleum piers at the port of Nampo, DPRK (the
"November 2019 DPRK Porting"), less than six weeks after the
September 2019 STS Transfer.  A copy of a satellite photograph
of the November 2019 DPRK Porting is attached as Exhibit C.

34.   According to the UN Report, "certain ports in the
Democratic People's Republic of Korea, in particular Nampo,
[serve] as hubs for suspected illegal activity," and there is
"widespread use of the Marine Import Terminal at Nampo by
tankers documented as engaged in illegal ship-to-ship
transfers."

### 4. Attempts to Conceal the Illicit Activities of M/T Courageous

35.   Materials obtained from communications accounts
associated with CC-1 and other participants in the DPRK Shipping
Scheme (the "Seized Materials") demonstrate that, in
communications with various individuals providing services
related to the registration and maintenance of M/T Courageous,
CC-1 and other participants in the DPRK Shipping Scheme made

false statements to conceal the illicit activity in which M/T
Courageous was engaged.   In particular, after CC-1 and other
participants in the DPRK Shipping Scheme registered M/T
Courageous with the flag state of Cameroon in or about November
2019, Cameroonian authorities inquired about reports that M/T
Courageous had been involved in illicit activity with North
Korea.   In response, CC-1 and others falsified records to
conceal, among other things, the September 2019 STS Transfer and
the November 2019 DPRK Porting.   For example:

        a.   On or about September 19, 2019, Individual-2
sent CC-1 an email that stated the following, in substance and
in part:

> Dear [CC-1],
> Good evening
> Received message from Cameroon deputy
> registra[r].
> Quote
> for tanker Sea PRIMA I checked OFAc list and
> Interpol and did not find it there, but we got
> notification from TOGO that vessel was cancelled
> from St KITTS and NAVIS for suspicious activity
> indicative of sanctions violations – can you send
> to me please deletion from ST KITTS and NEVIS
> enable to check it to tell you final reply.
> Unquote

        b.   In the September 19, 2019 email, it appears
that Individual-2 was conveying a message to CC-1 from the
Cameroonian shipping registration authorities that, while M/T
Courageous was not itself identified as a SDN by OFAC, a

neighboring nation, Togo, reported that M/T Courageous was

"cancelled," that is, potentially de-flagged, by St. Kitts and

Nevis for "suspicious activity" relating to violations of U.S.

sanctions.  As noted above, however, although M/T Courageous had

not itself been identified as an SDN by OFAC, the DPRK-flagged

Saebyol, with which M/T Courageous engaged in the September 2019

STS Transfer, had been specifically designated by both OFAC and

the United Nations as far back as 2016.  *See supra* ¶¶ 30-31.

        c.   Despite these concerns, on or about November

4, 2019, Cameroonian maritime authorities issued a provisional

registration for M/T Courageous, authorizing it to sail under

the Cameroonian flag.

        d.   On or about December 13, 2019, Individual-2

sent an email to CC-1, which stated, in substance and in part,

"Bill of Sale 19 July 2019 is the date you will know about your

ship . . . Then you sail out as SEA PREMA [sic] . . . During

these voyages, St Kitts and Nevis Deleted their flag on 21

August 2019 but your ship was at sea all the time."  Thus, it

appears that Individual-2 confirmed with CC-1 that M/T

Courageous was operating as a stateless vessel during the time

period of the September 2019 STS Transfer.

        e.   On or about January 19, 2020, Individual-2

sent an email to CC-2 (the Captain), copying, among others, CC-

1, stating "Please switch on AIS all the time as required by Cameroon Administration." In a response later that day, CC-2 (the Captain) wrote, "AIS was kept opened all the time sir." It appears this representation was false. As described above, *see supra* ¶ 25, M/T Courageous turned off its AIS signal during the Four Month Dark Period from approximately August 17, 2019 through approximately December 8, 2019, which included the time that M/T Courageous was captured in satellite images conducting both the September 2019 STS Transfer and the November 2019 DPRK Porting. In response to CC-2's apparently false representation, Individual-2 responded, in part, "Always refuse to do STS transfer with North Korea flag ships and do not go near North Korea waters."

      f.   Also on or about January 19, 2020, Individual-2 sent another email to CC-2 (the Captain), asking:

> Dear Captain
>
> Good morning
>
> Is your ship trading or operations in North Korea waters now ?
>
> Are you using ship name Courageous now
>
> Do you have Courageous registry and certificates?
>
> Please advise to me secretly so that I can try and clear the matter

21

When was the last time the ship was trading
with

North Korea ships for STS OPERATIONS

g.   CC-2 (the Captain) forwarded the email to
CC-1, asking him to "[k]indly provide the required documents."
Accordingly, it appears that Individual-2 was aware that M/T
Courageous had previously conducted prohibited ship-to-ship
transfers with North Korean vessels (i.e., "was trading with
North Korea ships for STS OPERATIONS"), that it lacked an
appropriate registration, and that it had conducted "operations
in North Korea waters," and asked CC-1 to "advise to me
secretly" in order to conceal the illicit nature of M/T
Courageous's activity.  Similarly, it appears that these
activities were directed by CC-1, based on CC-2's forwarding of
the email to CC-1, on the apparent understanding that CC-1 would
be able to provide documentation of the activity about which
Individual-2 was inquiring.

h.   Despite having issued a provisional
registration for M/T Courageous on or about November 4, 2019,
Cameroonian authorities continued to express concern about the
activities of M/T Courageous, and sought to obtain more
information to verify that the Cameroon flag was not being
abused by a vessel engaged in illegal activity.  On or about
January 24, 2020, Individual-2 forwarded CC-1 an email, which

Individual-2 had received on the previous day from an individual ("Individual-3") who appears to have been employed by a broker of shipping registration services, in which Individual-3 wrote, "Regarding COURAGEOUS we need to provide Cameroon with the last 10 ports of call."

        i.    The following day, on or about January 25, 2020, Individual-2 sent an email to CC-1, providing further information about the request from Cameroonian authorities for records of "the last 10 ports of call" of M/T Courageous. In the first line of the email, Individual-2 noted that it was "[r]egarding Sea Prima and it's owners which may have done commercial business with North Korea, some one who could be competitors had reported to Cameroon, (as if the business with North Korea was carried out recently as Courageous)." Individual-2 continued:

> North Korea is a sensitive UN issue.
>
> That is why Cameroon wants the last 10 ports list.
>
> It is a legal question according to IMO ISPS Code.[2]

---

[2] According to publicly available maritime reference documents, the term "ISPS Code" refers to the International Ship and Port Facility Security Code, an amendment to the Safety of Life at Sea Convention, which serves to, among other things, define the respective roles and responsibilities of all parties concerned with safeguarding maritime security in ports and on board ships, at the national, regional and international levels. Regulation

Your statements and supporting documents are very important to clear this vessel to continue as a permanent Cameroon Registry.

There can be a past mistake of this vessel with North Korea and my explanations are not satisfactory with the Authorities.

The registry Officer was sacked because of the news with North Korea and Courageous are related.

Thereby your statement is of utmost importance.

j.   It thus appears that Individual-2 was conveying to CC-1 that Cameroonian authorities were requesting information about M/T Courageous's activities in order to determine whether M/T Courageous had been involved in illegal trade with the DPRK in violation of the North Korea Sanctions, and that Individual-2 had been unable to provide an adequate explanation for those activities.  Individual-2 explicitly informed CC-1 that his representations on this point would be material to whether M/T Courageous could continue to be validly registered with Cameroonian maritime authorities.

k.   In response to Cameroon's request for information regarding the activities of M/T Courageous, on or about February 3, 2020, CC-1 sent an email to Individual-3,

---

9, Section 2.3 of the ISPS Code requires that a ship "shall keep records of the information . . . for the last 10 calls at port facilities."

purporting to describe "the Statement of Fact (Time Logs) of MT COURAGEOUS (ex Sea Prima) During July – December 2019 after we take delivery at Kaohsiung Port." In the email, CC-1 noted that on July 12, 2019, CC-2 (the Captain), whom CC-1 identified as "Our Rep," "boarded the ship for familiarization." CC-1 affirmed that "[f]or and on behalf of Owner (New Eastern Shipping Co., Ltd), hereby confirmed that, Ship did not go to North Korea for any Commercial Business after 19-July-2019, and we have neither intention to conduct illegal business nor sail to North Korea in the future for Commercial purpose." This representation was false. For example, as noted above, satellite imagery captured the November 2019 DPRK Porting of M/T Courageous, well after July 19, 2019. The email concluded with the signature "Sincerely Yours, Courageous Maritime S.A for and on behalf of NEW EASTERN SHIPPING Co., Ltd." Thus, it also appears that, although CC-1 is not identified as an owner or shareholder of New Eastern Shipping in records obtained to date in connection with the investigation, CC-1 was in fact responsible for controlling the operations of M/T Courageous. *See also supra* ¶ 19.

1. Attached to the email sent by CC-1 to Individual-3 on February 3, 2020 was a document entitled "Voyage Memo." The memo purported to provide information about the

activity of M/T Courageous between July 24, 2019, and December 8, 2019.  The memo identified CC-2 as the captain of M/T Courageous, and bore a signature and stamped seal of "MASTER MT COURAGEOUS."  According to the memo, M/T Courageous was on the "Hong Kong High Sea" between September 13, 2019 and October 1, 2019, traveling between identified latitude and longitude coordinates that correspond to locations in the South China Sea between Taiwan and Hong Kong.  This representation in the memo was also false.  As noted above, on or about September 24, 2019, M/T Courageous was not located in the South China Sea, but was in fact approximately 1,200 miles north in Korea Bay, conducting the September 2019 STS Transfer with the Saebyol, as captured in the satellite photograph reproduced as Exhibit B.  *See supra* ¶ 28.  Despite purporting to cover the period from July 24, 2019, and December 8, 2019, the memo also omits any information about M/T Courageous's activities between November 2, 2019 and December 8, 2019, which includes the time period when M/T Courageous was photographed in North Korean waters conducting the November 2019 DPRK Porting, as captured in the satellite photograph reproduced as Exhibit C.  *See supra* ¶ 33.  Thus, it appears that the memo was an attempt by CC-1, CC-2, and others to conceal from Cameroonian maritime registration authorities

recent activities of M/T Courageous in violation of the North Korea Sanctions.

      m.  On or about February 18, 2020, CC-1 sent an email to Individual-2 with documents that CC-1 indicated he "would like to send [to the] registrar." CC-1 included an affidavit from an individual purporting to represent New Eastern Shipping ("CC-4"), dated January 21, 2020, to the Ministry of Transport of the Republic of Cameroon, Department of Maritime Affairs and Inland Waterways (the "CC-4 Affidavit"). The CC-4 Affidavit stated that "Hereby, I/We, NEW EASTERN SHIPPING CO.,LTD, as owner, represented by its Director, [CC-2 (the Captain)] confirmed that The Ship name MT COURAGEOUS IMO No. 8617524 under Cameroon Registry did not go to North Korea for any commercial businesses." This representation in the CC-4 Affidavit was false. M/T Courageous was registered with Cameroon authorities on or about November 4, 2019. *See supra* 35(c). On the same day, the M/T Courageous was in fact located in port in Nampo, DPRK, as depicted in the satellite photograph of the November 2019 DPRK Porting reproduced as Exhibit C. *See supra* ¶ 18.

      36.  In or about March 2020, the M/T Courageous was detained by the Kingdom of Cambodia and a search was conducted of the vessel and electronic devices onboard. The search

revealed that the M/T Courageous had falsely identified itself as another ship, the "Sea Cheetah," a/k/a "Sea Cheeta," while engaging in illicit activities such as the September 2019 STS Transfer and the November 2019 DPRK Porting. For example, the following records were found onboard the M/T Courageous:

a.   A "Crew Personnel Currency List" dated November 1, 2019, days prior to the November 2019 DPRK Porting, that listed crew members, their ranks, and their salaries in U.S. currency under the vessel name "SEA CHEETA." This list matched the crew list for the M/T Courageous supplied to Taiwanese authorities, see supra ¶ 21. The port on the list was identified as "Namp'o." Commercially available shipping reports reflect that there is an India-flagged vessel genuinely registered under the name "Sea Cheetah," which was located in India from September to November 2019, not Nampo, North Korea.

b.   A letter dated on or about September 13, 2019, between the "MT. SEA CETAAH" and an unnamed vessel, set forth an agreement consistent with a planned high seas ship-to-ship transfer, such as the density in vacuum and density in air prior to the discharging and loading of cargo. The September 2019 STS Transfer occurred less than two weeks after the date on the letter of agreement. The "Sea Cheetah" "chief officer" is identified in the letter of agreement ("CC-5").

c.   A letter of resignation signed by CC-5 and dated on or about September 26, 2019, that is, approximately one day after the September 2019 STS Transfer, identified CC-5 as the "chief officer" of the "MT. SEA PRIMA," that is, M/T Courageous.

**D.   The Use of the U.S. Financial System to Pay for the M/T Courageous and Expenses Related to the DPRK Shipping Scheme**

37.   In furtherance of the DPRK Shipping Scheme, it appears that CC-1 has paid for the purchase of and service expenditures for M/T Courageous in U.S. dollars in transactions that he caused to be routed through U.S. financial institutions.

38.   U.S.-dollar denominated wire transfers are typically cleared through banks in the United States, many of which are located in the Southern District of New York.  The normal method for processing U.S. dollar payments is as follows: When a bank customer located outside the United States directs a payment denominated in U.S. dollars to a company in a third country, the customer's bank will debit its customer's account, then transmit the payment instruction to its correspondent U.S. bank.  The correspondent U.S. bank will, in turn, debit the customer's bank's U.S.-dollar correspondent account with the U.S. bank, while simultaneously transmitting those U.S. dollars from the account at the U.S. bank to the recipient's bank's

correspondent account.  Finally, the recipient's bank will credit its customer's account in the third country.  Such transfers constitute a provision of services by the U.S. correspondent bank to both the sender and recipient of the funds, and thus are prohibited by IEEPA and the North Korea Sanctions where the purpose of the payments is to benefit North Korea, including where a benefit from the payments is received in North Korea.  *See* 31 C.F.R. §§ 510.206, 510.405.

### 1. The Purchase of <u>M/T Courageous</u>

39.  As described above, CC-1, through the straw purchaser New Eastern Shipping, bought <u>M/T Courageous</u> in or about July 2019 for the sum of $580,000.  *See supra* ¶ 16.  The bill of sale and all payments for the purchase of the vessel were made in U.S. dollars, and at least one of those U.S.-dollar payments was made through U.S. Bank-1 located in the Southern District of New York, and was transmitted by a front company to conceal the identity of the originating payor.  *See supra* ¶ 18. CC-1 wrote to Individual-1 that the purpose of purchasing <u>M/T Courageous</u> was to use it for "our operations," *see supra* ¶ 19(a), and shortly after that June 25, 2019 email, began using <u>M/T Courageous</u> to violate the North Korea Sanctions by providing maritime services through the DPRK Shipping Scheme, including the September 2019 STS Transfer and the November 2019 DPRK

Porting.  Accordingly, it appears that the purpose of the purchase of M/T Courageous -- facilitated through the unwitting participation of U.S. financial institutions -- was to provide a benefit to North Korea by using M/T Courageous to conduct illicit shipping to the DPRK.

### 2. Crew Salary Payments for M/T Courageous

40.  In addition to purchasing M/T Courageous with U.S. dollars through, among others, U.S. Bank-1, CC-1 also used the U.S. financial system to pay critical expenses for the operations of M/T Courageous.

41.  Singapore corporate registry records list CC-1 as a director and shareholder of a company named "Swanseas Port Services."  CC-1 is also listed as the manager and owner of Swanseas Maritime, an entity 100% owned by Swanseas Shipping.

42.  According to transaction records, Swanseas Port Services made a series of payments in U.S. dollars for the salaries of the Captain and Chief Engineer of M/T Courageous,[3] between at least approximately October 2019 through November 2019.  Specifically:

a.  On or about October 7, 2019, Swanseas Port Services made a payment of $3,834.45 U.S. dollars in the name of

---

[3] The Captain and Chief Engineer were identified on the crew list obtained by Taiwanese authorities.  *See supra* ¶ 15(g).

CC-3, the Chief Engineer, bearing the memorandum line "[CC-3] Salary Sep '19."

b.    As described above, M/T Courageous conducted the September 2019 STS Transfer with the U.S. and UN-designated DPRK-flagged vessel Saebyol, *see supra* ¶ 28, during the time period for which it appears that Swanseas Port Services used the U.S. financial system to pay the salary of the Chief Engineer of M/T Courageous, a critical officer for the execution of an illicit ship-to-ship transfer.

c.    On or about November 13, 2019, Swanseas Port Services made a payment of $4,034.11 U.S. dollars to another individual, bearing the memorandum line "Capt [CC-2] Oct Salary."

d.    On or about November 20, 2019, Swanseas Port Services made a payment of $4,457.60 U.S. dollars in the name of CC-3, bearing the memorandum line "[CC-3] Salary Oct '19."

e.    On or about December 10, 2019, Swanseas Port Services made a payment of $4,034.07 U.S. dollars to another individual ("Individual-4"), bearing the memorandum line "Capt [CC-2] Nov Salary." According to U.S. Customs and Border Protection records, Individual-4 entered the United States approximately one week following this payment, and identified CC-2 as Individual-4's father to U.S. customs authorities.

   f.   On or about December 27, 2019, Swanseas Port Services made a payment of $5,333.95 U.S. dollars in the name of CC-3, bearing the memorandum line "CC-3 Salary Nov '19."

   g.   As described above, M/T Courageous conducted the November 2019 DPRK Porting, *see supra* ¶ 33, during roughly the same time period for which it appears that Swanseas Port Services used the U.S. financial system to pay the salary of the Captain of M/T Courageous (CC-2) and the vessel's Chief Engineer (CC-3), critical officers for the arrival and berthing of M/T Courageous in Nampo, North Korea.

### 3. Acquisition of Oil for the September 2019 STS Transfer

   43.   The Seized Materials reflect that the oil supplied to the DPRK-flagged SDN vessel Saebyol during the September 2019 STS Transfer was acquired approximately two weeks before the transfer.  On or about September 3, 2019, M/T Courageous conducted another STS transfer with a different vessel ("Vessel-1").  During this transaction, approximately 2,871.970 metric tons of gasoline were loaded from Vessel-1 onto M/T Courageous.

   44.   The gasoline was purchased on or about August 3, 2019 through three separate U.S. dollar payments transmitted by three separate corporate entities, specifically, payments of

$1,199,770.00, $373,522.80, and $93,363.92.    The cargo clearance permit identified the carrier agent for the transaction as "Swanseas Shipping (S) PTE Ltd.," that is, CC-1's company. Accordingly, it appears that CC-1 purchased fuel using U.S. dollars for the purpose of delivering it on board <u>M/T Courageous</u> to the <u>Saebyol</u>, a DPRK-flagged vessel designated as an SDN designated under the NKSPEA.

### 4. Registration and Other Service Payments for <u>M/T Courageous</u>

45.    In addition to the purchase of <u>M/T Courageous</u> and payments for the salaries of critical officers during the time periods of the September 2019 STS Transfer and the November 2019 DPRK Porting, CC-1 also appears to have used the U.S. financial system to make payments related to the Cameroon registration and other services for <u>M/T Courageous</u>.

a.    On or about September 7, 2019, Individual-2 sent CC-1 an email attaching two invoice documents.    Both invoices were payable to Company-1 in U.S. dollars, and made out to "Courage Maritime S.A."

i.    The first invoice, which is assigned number "CM/GAM-09-19-002," is for $6,786.00, and lists expenses related to the registration of <u>M/T Courageous</u> under a Cameroon flag, as well as the purchase of documents that a vessel is

34

required to maintain to be permitted to operate on the high seas, including a "Minimum Safe Manning Certificate," which prescribes the particular complement of officers and crewmembers who must be on board the vessel to operate it safely, and a "Continuous Synopsis Record," which provides identifying information about the vessel, its IMO number, its flag state registration, its ownership, and various other certifications of continuous compliance with international maritime regulations.

        ii.    The second invoice, which is assigned number "CM/GAM-09-19-003," is for $2,800.00, and lists expenses related to hiring a marine surveyor to inspect M/T Courageous. A marine surveyor conducts inspections or examinations of vessels to assess their condition, as well as to inspect mandatory equipment on board the vessel (such as navigation tools and radios) to ensure that they are in compliance with applicable marine regulations.

        b.    On or about September 18, 2019, Individual-2 sent CC-1 an email, stating that Individual-2 had "[r]eceived your remittance," and that "You can start applying Cameroon as owners." The email also attached a payment confirmation from Company-2's Thailand-based bank. According to the payment confirmation, Swanseas Port Services paid Company-1 $10,809.00 in U.S. dollars. The "Details of Payment" specified that the transaction was for

"INVOICE CM/GAM-09-19-002, 003."   The payment confirmation also verified that the transaction was processed by U.S. Bank-1, which is located in the Southern District of New York.   Accordingly, it appears that CC-1 paid for critical services for M/T Courageous through U.S. dollar transactions processed by a U.S. financial institution, while obfuscating the purpose of those transactions by making the payments through the front company Swanseas Port Services, even though the invoices for which the payment was being made had been billed to Courage Maritime.

   c.   On or about January 7, 2020, Individual-2 sent CC-1 an email, stating, "Dear [CC-1], Good Day.   Attached two invoices for payment."   Both invoices were made payable to Company-1 in U.S. dollars and are made out to "Courage Maritime S.A."   This set of invoices specifically identified Courage Maritime S.A. as "Owner of: MT COURAGEOUS."[4]

   i.   The first invoice, which was assigned number "CM/GAM-01-20-001," was for $6,438.75, for the purchase of "Statutory Certificates" for M/T Courageous.

---

[4] As noted above, the documented owner of M/T Courageous is in fact New Eastern Shipping, a straw purchaser operating on behalf of CC-1 and CC-1's company Courage Maritime S.A.   *See supra* ¶ 15(e).

   ii. The second invoice, which was assigned number "CM/GAM-01-20-003," in the amount of $2,280.00, was for purchase of "Statutory Full Term Certificates Administration" and "Manuals Approval (SOPEP, STS, Towing, Stability Booklet, BWMP)." The acronyms in this invoice described various reference documents typically kept on board merchant vessels to serve as a guide for how to handle certain types of situations that may arise while a vessel is underway. For example, "SOPEP" stands for "Shipboard Oil Pollution Emergency Plan," "BWMP" stands for "Ballast Water Management Plan," and "STS" refers to a "Ship To Ship Transfer Manual."

   d. On or about January 9, 2019, Individual-2 sent CC-1 an email, which stated that Individual-2 had "[r]eceived your remittance with thanks. Statement is attached." As described, the email also attached a payment confirmation from Company-1's Thailand-based bank. According to the payment confirmation, Company-1 received $8,691.75 in U.S. Dollars from Swanseas Port Services. The "Details of Payment" specified that the transaction was for "INVOICE NR. CM/GAM-01-20-001, 002." This payment confirmation, like the previous one, verifies that the transaction was processed by U.S. Bank-1, which is headquartered in the Southern District of New York. Accordingly, it appears that CC-1

again paid for critical services for M/T Courageous through U.S. dollar transactions processed by a U.S. financial institution, while obfuscating the purpose of those transactions by making the payments through the front company Swanseas Port Services, even though the invoices for which the payment was being made had been billed to Courage Maritime S.A., which had been falsely identified as the owner of M/T Courageous.

### E.   The Seizure of M/T Courageous

46.   On or about April 2, 2020, the Honorable Sarah L. Cave, United States Magistrate Judge, issued a warrant, pursuant to 18 U.S.C. § 981, authorizing the seizure of M/T Courageous. At the time, the Courageous was in the custody of law enforcement and maritime authorities of the Kingdom of Cambodia. Pursuant to an agreement between Cambodia and the United States, M/T Courageous is currently in the custody of the United States.

### V. CLAIMS FOR FORFEITURE

47.   The statutory provisions pursuant to which M/T Courageous is subject to seizure and forfeiture are described below.

### A.   Proceeds Traceable to Violations of IEEPA

48.   Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds

38

traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

49. Under § 1956(c)(7), the term "specified unlawful activity" includes, among other things, violations of "section 206 (relating to penalties) of the International Emergency Economic Powers Act [50 U.S.C. § 1705]." Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a).

50. As set forth above, the DPRK Shipping Scheme violated IEEPA and the North Korea Sanctions by willfully causing the transmission of U.S.-dollar payments through U.S. financial institutions to pay for the operations of M/T Courageous, including the purchase of and various necessary services for the vessel. Accordingly, M/T Courageous constitutes or was derived from proceeds traceable to violations of IEEPA, and is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**B.   Property Involved in International Promotion of Specified Unlawful Activity Money Laundering**

51.   Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of . . . section 1956 or 1957 of this title [relating to money laundering], or any property traceable to such property."

52.   Section 1956(a) provides criminal penalties for

(a)(2) [w]hoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--

(A) with the intent to promote the carrying on of specified unlawful activity[.]

53.   As set forth above, violations of IEEPA constitute "specified unlawful activity" under § 1956.

54.   The DPRK Shipping Scheme also violated 18 U.S.C. § 1956(a)(2)(A), by transmitting funds to and from the United States to promote the scheme to violate IEEPA and the North Korea Sanctions to pay for the operations of M/T Courageous, including the purchase of and various necessary services for the vessel.  Accordingly, M/T Courageous constitutes property involved in money laundering transactions in violation of

40

Section 1956, and is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

   **C.   Property Involved in a Violation of the NKSPEA**

      55.   Title 18, United States Code, Section 981(a)(1)(I) subjects to forfeiture "[a]ny property, real or personal, that is involved in a violation or attempted violation, or which constitutes or is derived from proceeds traceable to a prohibition imposed pursuant to section 104(a) of the North Korea Sanctions and Policy Enhancement Act of 2016."

      56.   Section 104(a) of the NKSPEA, codified at 22 U.S.C. § 9214(a), requires the President to designate as an SDN, and therefore to prohibit transactions through the U.S. financial system for the benefit of, any entity that "knowingly, directly or indirectly, provides significant amounts of fuel or supplies, provides bunkering services, or facilitates a significant transaction or transactions to operate or maintain, a vessel or aircraft that is designated under an applicable Executive order or an applicable United Nations Security Council resolution."

      57.   As described above, the Saebyol -- the DPRK-flagged vessel with which M/T Courageous engaged in the September 2019 STS Transfer -- has been "designated under an

41

applicable Executive order or an applicable United Nations Security Council resolution." 22 U.S.C. § 9214(a).

58. The DPRK Shipping Scheme also violated prohibitions imposed pursuant to 22 U.S.C. § 9214(a), by transmitting funds through U.S. financial institutions for the benefit of the Saebyol -- an SDN vessel -- including the purchase by CC-1's company of the fuel transferred from M/T Courageous to the Saebyol and the salary payments for critical crewmembers of M/T Courageous necessary to conduct the September 2019 STS Transfer with the Saebyol. Accordingly, M/T Courageous constitutes property involved in a violation of 22 U.S.C. § 9214(a), and is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(I).

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of M/T Courageous and that all persons having an interest in M/T Courageous be cited to appear and show cause why the forfeiture should not be decreed, and that the Court decree forfeiture of M/T Courageous to the United States of America for disposition according to law and that the Court grant plaintiff such further relief as the Court may deem just and proper together with the costs and disbursements in this action.

Dated:    New York, New York
          April 22 , 2021

                         AUDREY STRAUSS
                         United States Attorney for
                         Plaintiff United States of America

By: _____

          DAVID W. DENTON, JR.
          KIMBERLY J. RAVENER
          Assistant United States Attorneys
          One St. Andrew's Plaza
          New York, New York 10007
          (212) 637-2744/2358

43

VERIFICATION

STATE OF NEW YORK            )
COUNTY OF NEW YORK           :
SOUTHERN DISTRICT OF NEW YORK )

KEVIN SAMAROO, being duly sworn, deposes and says that

he is a Special Agent with the Federal Bureau of Investigation

("FBI"); that he has read the foregoing complaint and knows the

contents thereof, and that the same is true to the best of his

knowledge, information and belief.

The sources of deponent's information and the grounds

of his belief are his personal involvement in the investigation,

and conversations with and documents prepared by law enforcement

officers and others.

KEVIN SAMAROO
Special Agent
Federal Bureau of Investigation

Sworn to before me this
7th day of April, 2021

Notary Public

NERLANDE PIERRE
Notary Public, State of New York
Qualified in Queens County
No. 01PI6184310
My Commission Expires April 7, 2024   44

EXHIBIT A



EXHIBIT B



EXHIBIT C



Foreign-Flagged Tanker Arrives at Port
Nampo, North Korea
38:43:17 N 125:24:35 E

Sea Prima: IMO: 8617524